# FOSHEE & TURNER COURT REPORTERS

---

**Page 1**

```
 1      IN THE CIRCUIT COURT OF
 2         CHOCTAW COUNTY
 3
 4   CIVIL ACTION NUMBER 2000-10-C
 5
 6   ORA RUFFIN,
 7      Plaintiff(s),
 8   vs.
 9   CONGRESS LIFE INSURANCE COMPANY,
10   et al.,
11      Defendant(s).
12
13      DEPOSITION TESTIMONY OF:
14         JOHN MACBAIN
15
16      S T I P U L A T I O N
17      IT IS STIPULATED AND AGREED by
18   and between the parties through their
19   respective counsel that the deposition of
20   JOHN MACBAIN, may be taken before Kelly
21   B. Jackson, Registered Professional
22   Reporter and Notary Public, State at
23   Large, at the law offices of Bradley,
```

**Page 2**

```
 1   Arant, Rose & White, 1400 Park Place
 2   Tower, Birmingham, Alabama, on the 5th
 3   day of June, 2002, commencing at
 4   approximately 9:30 a.m.
 5      IT IS FURTHER STIPULATED AND
 6   AGREED that the signature to and the
 7   reading of the deposition by the not
 8   witness is waived, the deposition to have
 9   the same force and effect as if full
10   compliance had been had with all laws and
11   rules of Court relating to the taking of
12   depositions.
13      IT IS FURTHER STIPULATED AND
14   AGREED that it shall not be necessary
15   for any objections to be made by counsel
16   to any questions, except as to form or
17   leading questions and that counsel for
18   the parties may make objections and
19   assign grounds at the time of trial or
20   at the time said deposition is offered
21   in evidence, or prior thereto.
22         In accordance with Rule 5(d)
23   of the Alabama Rules of Civil Procedure,
```

**Page 3**

```
 1   as amended, effective May 15, 1988, I,
 2   Kelly B. Jackson, am hereby delivering to
 3   Philip Carroll the original transcript of
 4   the oral testimony taken the 5th day of
 5   May, 2002, along with exhibits.
 6      Please be advised that this
 7   is the same and not retained by the
 8   Court Reporter, nor filed with the
 9   Court.
```

**Page 4**

```
 1            I N D E X
 2   EXAMINATION BY:          PAGE NO.
 3   Mr. Carroll          7
 4   Mr. Latta           60
 5   Mr. Bolus           69
 6   Mr. Cowan           77
 7   Mr. Latta          121
 8   Mr. Bolus          126
 9   Mr. Cowan          133
10   Mr. Latta          142
11
12         E X H I B I T S
13   Plaintiff's Exhibit 1      100
14   Plaintiff's Exhibit 2      101
15   Plaintiff's Exhibit 3      103
16   Defendant's Exhibit 1      122
```

**Page 5**

```
 1         A P P E A R A N C E S
 2   FOR THE PLAINTIFF(S):
 3      DAVID COWAN, ESQ.
 4      Mann & Cowan
 5      2000-A Southbridge Parkway
 6      Birmingham, Alabama  35209
 7   FOR THE DEFENDANT(S):
 8      FORREST S. LATTA, ESQ.
 9      Pierce, Ledyard, Latta, Wasden
10         & Bowron
11      Suite 400, 41 North Beltline
12      Mobile, Alabama  36608
13
14      PHILIP J. CARROLL, III, ESQ.
15      Bradley, Arant, Rose & White
16      1400 Park Place Tower
17      Birmingham, Alabama  35203
18
19      W. BRAD ENGLISH, ESQ.
20      Richardson-Callahan
21      3301 Washington Street
22      Suite 450
23      Huntsville, Alabama  35801
```

**Page 6**

```
 1   FOR THE DEFENDANT:(Cont'd)
 2      PAUL BOLUS, ESQ.
 3      Burr & Forman
 4      3100 SouthTrust Tower
 5      Birmingham, Alabama  35203
 6
 7      RICHARD E. TREWHELLA, ESQ.
 8      Lloyd, Gray & Whitehead
 9      2501 20th Place South
10      Birmingham, Alabama  35209
```

**EXHIBIT H**

FOSHEE & TURNER COURT REPORTERS

### 79

1  tell me in our telephone conversation
2  that tiering was a move away from the
3  concept of insurance?
4       A.  It moves more away from the
5  assigning of the risk to the premium --
6  insurance is pooling of risks. And the
7  more you drill down, is the phrase I use,
8  the move you get to charging an
9  individual the exact premium for that
10 person's experience, which then would not
11 be insurance.
12      Q.  Then, in generalities, you
13 would agree that tiering is a move away
14 from the concept of insurance?
15      A.  Relative to like age and sex
16 rating, I would agree that that's the
17 case, yes.
18      Q.  And I believe you also told
19 me that you would not come up here to
20 Birmingham and condone the use of tiering
21 in the setting of premiums in health
22 insurance policies, true?
23      A.  At the present time, that is

### 80

1  true.
2       Q.  Do you agree with me that a
3  practice that is common in the industry
4  and generally accepted in the industry
5  can be abused?
6       A.  Oh, yes.
7       Q.  And you have seen insurance
8  companies take a concept that on its face
9  may seem fair, may seem totally logical
10 and abuse it, haven't you?
11      A.  I am trying to think of a
12 particular situation.
13      Q.  I guess --
14      A.  It is possible to do that. I
15 can't think of a particular situation at
16 this point.
17      Q.  I guess what I am getting at
18 is you told me that insurance companies
19 were very clever and, they are, aren't
20 they?
21      A.  They are very intelligent,
22 yes, they have some very expert people.
23      Q.  And so an insurance company

### 81

1  can take a common practice and abuse the
2  purpose of that practice, can't they?
3       A.  Should they so desire, they
4  could do that.
5       Q.  And the only thing that keeps
6  an insurance company from doing that is
7  the ethics and morals of the people
8  running the company, true?
9           MR. LATTA: Object to the
10 form.
11          MR. CARROLL: Same objection.
12          MR. BOLUS: Same objection.
13      A.  That is one of the things,
14 plus regulation would be another area.
15      Q.  For example, the department
16 might approve a specific type of rating,
17 but then after your approval, that rating
18 could be abused by the company, couldn't
19 it?
20      A.  I guess hypothetically it
21 could be.
22      Q.  Same thing with a policy
23 form, the department could approve a

### 82

1  policy form and then later the insurance
2  could take the form and abuse it,
3  couldn't they?
4       A.  That would be possible.
5       Q.  The same would be true for a
6  policy filed in Mississippi with
7  certificates sold in Alabama, it could be
8  approved in Mississippi, therefore,
9  quote, approved in Alabama and then be
10 abused, couldn't it?
11      A.  That would be a possibility,
12 yes.
13      Q.  And just so I am clear, the
14 Alabama Department of Insurance did not
15 approve this particular master policy,
16 that was done in Mississippi?
17      A.  Yes, sir.
18      Q.  The Alabama Department of
19 Insurance did not approve of the way the
20 rates were set on this policy, did they?
21      A.  You said did not approve of
22 the way?
23      Q.  Yes, sir.

### 83

1       A.  The best I can say is we did
2  not disapprove the way. We were -- and
3  probably not actually aware of it.
4       Q.  That is a better question.
5  It was not submitted to the Department of
6  Insurance in Alabama for approval, was
7  it?
8       A.  Not to my recollection, no.
9       Q.  You mentioned and there has
10 been some general discussion that the
11 purpose of tiering is to keep healthy
12 risks in the pool, that is the general
13 concept?
14      A.  That is one of the results --
15 that is one of the results of tiering,
16 yes. Whether it is a purpose, you would
17 have to ask the insurance company, but
18 that's what it does.
19      Q.  Well, if that's what it does,
20 I can only presume that that is what you
21 would think most insurance companies'
22 intent would be if they are going to use
23 that system?

### 84

1       A.  I can't comment on their
2  intent, but that certainly is one of the
3  results of tier rating.
4       Q.  If you assume for me that an
5  insurance company implements a tier
6  rating system with the specific goal and
7  intent to drive off sick people, to run
8  sick people out of the coverage, would
9  you condone that practice?
10      A.  I would not condone that
11 practice if there was proof that it was
12 being done and that's -- the phraseology
13 I am not sure I would agree with. To run
14 people off.
15      Q.  I want you to assume for the
16 purpose of my question in this
17 hypothetical that we are talking about an
18 insurance company through tier rating
19 targets people who are sick or who have
20 been injured or people who they think may
21 have high claims experience in the
22 future, with the specific goal and intent
23 to drive them away from the policy, to

A Legalink Company * 2001 Park Place, Suite 220 * Birmingham, AL 35203 * www.foshee-turner.com
1-800-888-DEPO

**FOSHEE & TURNER COURT REPORTERS**

85

1  run them off, that would not be a
2  practice you would approve of, would it?
3     A.  I would have to say, no, with
4  those circumstances.
5     Q.  That wouldn't be fair to
6  those people, would it?
7     A.  It would cause --
8     Q.  My question is that wouldn't
9  be fair to those people, would it?
10    A.  Are you asking my personal
11 opinion?
12    Q.  I am asking you here today.
13    A.  Fairness -- fairness is a
14 legal term. It might be -- the
15 consequence of tier rating is that it
16 charges a risk a premium more
17 commensurate with the risk. Tier rating
18 whether it is acceptable or not is not up
19 to me. It is a legal condition or if
20 there are laws that prohibit it, that
21 sort of thing. Tier rating has that
22 effect. It charges individuals a premium
23 closer to their actual experience. That

86

1  has the effect of charging higher
2  premiums to higher risk individuals.
3  Whether that is acceptable to me and I
4  agree with it or not is not in my opinion
5  relevant. It is whether it is legally
6  acceptable and -- you know, as an
7  individual if I thought it was being done
8  for adverse reasons, I might not like it
9  as an individual. But that does not deal
10 with whether it is an acceptable or legal
11 practice.
12    Q.  I object and move to exclude
13 as non-responsive. I need you to listen
14 to my question. If you can't answer it,
15 tell me you can't answer it.
16        Are you here today to tell
17 the jury in Choctaw County that if an
18 insurance company implemented a tier
19 rating system with the specific design
20 and intent to run, drive off sick people,
21 to make them leave the coverage, you are
22 not here today to say that is an
23 acceptable practice, are you?

87

1     A.  I am not -- if that was
2  proven, that maybe would break other laws
3  in the state of Alabama.
4     Q.  From John MacBain, the
5  actuarial expert, your standpoint, your
6  point of view, that would be totally
7  inappropriate if that was the specific
8  design and goal of the company; correct?
9     A.  From a personal perspective,
10 I would not find that acceptable.
11    Q.  If an insurance company came
12 to you today, health insurance company on
13 a group contract and said, Mr. MacBain,
14 we are going to implement tiering and we
15 are going to target people who are sick
16 or hurt or who we expect to have high
17 claims utilization and we are going to do
18 it to get rid of these people, we are
19 going to drive them out of the policy,
20 that is what we want to do to help our
21 profits, you would tell them don't do it,
22 wouldn't you?
23    A.  Yes, sir, as -- I would

88

1  today.
2     Q.  And you would have surely as
3  soon as you learned of what this
4  insurance tiering was, you wouldn't have
5  waited until today, would you? Let's go
6  back to 1995, if an insurance company
7  came to you then and said, look, Mr.
8  MacBain, we want to hire you as our
9  actuarial expert, we need to get rid of
10 some of these sick people and we are
11 going to use tier rating to do it, we are
12 going to target them for increases to see
13 if we can run them off, you would have
14 told them not to do it, wouldn't you?
15    A.  I would have told them to
16 find another consulting actuary.
17    Q.  And the reason for that is
18 very simply, at least from your
19 standpoint, that would not be fair to
20 those people, would it?
21    A.  From a personal perspective?
22    Q.  Yes, sir.
23    A.  I would not condone tier

89

1  rating.
2     Q.  Do you believe an insurance
3  company back in 1993, '94 and '95 without
4  the Department of Insurance telling them
5  anything should have known that it would
6  be an abuse of a tier rating practice to
7  target sick and injured people for the
8  specific purpose of driving them out of
9  their policy?
10        MR. BOLUS: Object to the
11 form.
12        MR. LATTA: Object to the
13 form.
14        MR. CARROLL: Object to the
15 form.
16    A.  I can't comment on what they
17 would have known or would have not known.
18    Q.  I said you should have.
19        MR. LATTA: Same objection.
20    Q.  In 1994 and 1995 do you think
21 insurance companies should have known
22 that it is an abusive practice to target
23 sick and injured people for the specific

90

1  purpose of running them out of the
2  policy? They should have known that,
3  shouldn't they?
4         MR. LATTA: Object to the
5  form.
6         MR. BOLUS: Same objection.
7         MR. CARROLL: Same objection.
8     A.  I can't comment on what they
9  should or should not have known. I don't
10 know the degree of their expertise or who
11 they had. I can't comment on that.
12    Q.  Let's assume that they had
13 qualified, honorable, moral actuaries
14 like you, they should have known it,
15 shouldn't they?
16        MR. LATTA: Object to the
17 form.
18        MR. BOLUS: Same objection.
19        MR. CARROLL: Same objection.
20    A.  It is hypothetical.
21    Q.  It is hypothetical. But I
22 need you to answer it. If they -- if in
23 '94 and '95 insurance companies had moral