```
              1
IN THE CIRCUIT COURT OF MONTGOMERY COUNTY
            STATE OF ALABAMA

SHIRLEY K. WADSWORTH,      )
                           )
     Plaintiffs,           )
                           )
  vs.                      )  CV 02-2850-H
                           )
UNITED WISCONSIN LIFE      )
INSURANCE COMPANY, et al., )
                           )
     Defendant.            )
_____


       DEPOSITION OF:   BARBARA WATSON
_____


              S T I P U L A T I O N

     IT IS STIPULATED AND AGREED by and
between the parties through their respective
counsel that the deposition of BARBARA
WATSON may be taken on February 12, 2003,
before Anne E. Miller, Commissioner and
Notary Public, at Lowe, Grammas, Hitson &
Dana, 3500 Blue Lake Drive, Suite 209,
Birmingham, Alabama.
```

```
                                               2
     IT IS FURTHER STIPULATED AND AGREED
that the signature to and the reading of the
deposition by the witness is waived, the
deposition to have the same force and effect
as if full compliance had been had with all
laws and rules of court relating to the
taking of depositions.
     IT IS FURTHER STIPULATED AND AGREED
that it shall not be necessary for any
objections to be made by counsel to any
questions except as to form or leading
questions, and that counsel for the parties
may make objections and assign grounds as
the time of trial or at the time said
deposition is offered in evidence or prior
thereto.
```

```
                                               3
                 APPEARANCES

Appearing For The Plaintiff:

     LOWE, GRAMMAS, HITSON & DANA
     Mr. E. Clayton Lowe, Jr.
     Mr. Brent Hitson
     3500 Blue Lake Drive
     Suite 209
     Birmingham, Alabama 35243

Appearing For The Defendant:

     BURR & FORMAN
     Mr. Harlan F. Winn, III
     3100 SouthTrust Tower
     Birmingham, Alabama 35203

     JANECKY, NEWELL
     Ms. Nancy Howell Lard
     1475 Financial Center
     Birmingham, Alabama 35203

Court Reporter:  Anne E. Miller
```

RECEIVED JUN 0 6 2005

```
                                               4
                    INDEX

Examination by Mr. Lowe ............... 5

Plaintiff's Exhibit 1  ................  34
Plaintiff's Exhibit 2  ................  56
Plaintiff's Exhibit 3  ................  82
Plaintiff's Exhibit 4  ................  98
Plaintiff's Exhibit 5  ................ 104
Plaintiff's Exhibit 6  ................ 104
Plaintiff's Exhibit 7  ................ 182
Plaintiff's Exhibit 8  ................ 186
Plaintiff's Exhibit 9  ................ 193
Plaintiff's Exhibit 10 ................ 202
Plaintiff's Exhibit 11 ................ 204
Plaintiff's Exhibit 12 ................ 209
Plaintiff's Exhibit 13 ................ 214
Plaintiff's Exhibit 14 ................ 226
Plaintiff's Exhibit 15 ................ 230
Plaintiff's Exhibit 16 ................ 236
Plaintiff's Exhibit 17 ................ 237
Plaintiff's Exhibit 18 ................ 254
Plaintiff's Exhibit 19 ................ 265
Plaintiff's Exhibit 20 ................ 275
```

EXHIBIT C

57

1  application, yes, I have seen one.
2    Q. How did you come to see an
3  application? Was it in preparation for this
4  deposition or is it something that you
5  handled in administering this trust?
6    A. It was in preparation for the
7  deposition.
8    Q. So you hadn't seen one before?
9    A. No. I would have no reason to.
10    MR. WINN: Just answer his question.
11    Q. Was this a document that the bank has
12  in its possession or similar document?
13  Maybe not signed by Shirley Wadsworth but
14  this form?
15    A. No.
16    Q. So how did you come to see it then?
17    MR. WINN: She said she saw it in
18  connection with her deposition preparation,
19  and that's all I'm going to allow her to
20  testify about.
21    Q. (BY MR. LOWE) Let's look at the
22  first paragraph of Exhibit 2. It says, "The
23  undersigned applicant hereby agrees to

58

1  participate in the American Medical Security
2  or Prescription for Good Health Trust.
3  Insurance is provided through policies
4  procured by the trustee of American Medical
5  Security or Prescription for Good Health
6  Trust." Did I read that correctly?
7    A. Uh-huh (yes).
8    Q. Who is the trustee of the American
9  Medical Security Trust?
10    A. The trustee for the Prescription for
11  Good Health Trust is AmSouth.
12    Q. Who is the trustee for American
13  Medical Security Trust?
14    A. I believe AmSouth is.
15    Q. Now this document, are you aware that
16  this document is given to perspective
17  participants to sign up to become
18  participants in the group insurance trust?
19    A. No.
20    Q. You don't understand that?
21    A. Would you say that again?
22    Q. Do you understand that this document,
23  Exhibit 2, that's entitled "terms and

59

1  conditions of the trust," is given to
2  perspective participants such as Shirley
3  Wadsworth in order to allow them to apply to
4  become participants in the group insurance
5  trust?
6    A. Yes.
7    MR. WINN: I want to object to the
8  question. To the extent that you are asking
9  her about a piece of a document, it's not a
10  complete document there. You can answer the
11  question, but I think it's unfair.
12    MR. LOWE: Well, we disagree about
13  whether it's a complete document.
14    MR. WINN: That's fine. I'm just
15  making my objection.
16    Q. (BY MR. LOWE) And your answer, I
17  think I heard you say yes?
18    A. Yes.
19    MR. WINN: You are right. That's
20  what she said.
21    Q. The last sentence I read, focus on
22  that. It references that the policies are
23  procured by the trustee. Did AmSouth

60

1  procure the policies of insurance that
2  relate to the Prescription for Good Health
3  Trust?
4    MR. WINN: Object to the form of the
5  question. I think it's confusing, but if
6  you understand it, you can answer.
7    A. AmSouth procures or gets the master
8  policies for the Prescription for Good
9  Health Trust, and it's my understanding that
10  certificates are then issued by someone
11  other than AmSouth to the actual insureds.
12    Q. What does AmSouth do to procure this
13  insurance for the trust referenced in
14  Exhibit 2?
15    A. There is an application. AmSouth as
16  trustee is the applicant and they apply for
17  the policy, the master policy, to United
18  Wisconsin.
19    Q. Does AmSouth make any effort to
20  determine whether one policy provided by
21  United Wisconsin may be a better policy than
22  another?
23    A. No.

117

```
 1  base the statements made in this affidavit
 2  upon?
 3     A.  The only records I reviewed
 4  specifically before signing this one is the
 5  Prescription for Good Health.  Now I have
 6  seen in my year --
 7     MR. WINN:  Just answer the question
 8  that he asked.
 9     Q.  And your answer was?  He cut you off.
10  What was your answer?
11     A.  The only one I read directly before
12  signing this one was the Prescription for
13  Good Health Trust.
14     Q.  Now what part of this affidavit then
15  is based upon your personal knowledge
16  derived from your employment
17  responsibilities and duties?
18     MR. WINN:  If you need to read it --
19  are you asking for a particular portion of
20  this affidavit?
21     MR. LOWE:  Yes.  Take your time and
22  look at it again.
23     A.  Well, I handled the group insurance
```

118

```
 1  trust, the accounts themselves for a period
 2  of time.  So I had personal knowledge in
 3  handling them.
 4     Q.  What did you do to handle them?  I
 5  guess we haven't really touched on that
 6  enough.
 7     A.  You accept the policies.  You hold
 8  the policies.  You fee for your services.
 9  If an application comes in for a group
10  policy, then you review it and --
11     Q.  How about corresponding with
12  Departments of Insurance or regulatory
13  authorities or anything like that that have
14  a question of AmSouth regarding the trust?
15  Is that something you also handled?
16     A.  I never personally handled any
17  correspondence.
18     Q.  Did you supervise that?
19     A.  No.
20     Q.  Did people under you handle that?
21     A.  No.
22     Q.  Are you saying that didn't happen?
23     A.  No.  I'm not saying that didn't
```

119

```
 1  happen.  My personal knowledge, I don't know
 2  of correspondence.
 3     Q.  So is it fair to say then in your
 4  handling of this trust that you never had
 5  any correspondence or prepared any forms
 6  that you knew were going to a Department of
 7  Insurance or the Department of Labor or
 8  anything like that?
 9     A.  Yes.
10     Q.  You did do that?
11     A.  No.  It's fair to say I did not do
12  that.
13     Q.  Okay.  And to your knowledge then, no
14  one else at the bank did that?
15     MR. WINN:  To your knowledge is what
16  he is asking.
17     A.  To my knowledge, I don't know.
18     Q.  (BY MR. LOWE)  Let's look at
19  paragraph three of your affidavit, Exhibit
20  5.  Do you see where it says "this trust
21  owns group insurance contracts as is
22  described in the trust agreement"?  Do you
23  see that?
```

120

```
 1     A.  Uh-huh (yes).
 2     Q.  We talked a little bit about group
 3  insurance earlier.  Do you know the
 4  distinction between individual insurance and
 5  group insurance?
 6     MR. WINN:  Object to the extent it
 7  calls for a legal conclusion.  Otherwise,
 8  you can answer what you know.
 9     A.  Well, I mean, I think I have a basic
10  understanding of what is the difference
11  between an individual policy and a group
12  insurance policy.
13     Q.  I assume you have insurance policies
14  for yourself, don't you?
15     A.  Right.
16     Q.  And I would also assume -- and tell
17  me if I'm wrong -- that the ones you
18  probably have through your employer are
19  group insurance, right?
20     A.  Yes.
21     Q.  And it's because you are a large
22  group of employees; is that right?
23     A.  Uh-huh (yes).
```

### Page 129

1  that right?
2       MR. WINN:  Object to the form of the
3  question.
4       A.  The document states that we hold the
5  policies.
6       Q.  Among other things, true.  I mean,
7  that's what it says in one instance.  But
8  you have stated here that this insurance
9  policy was issued for the benefit of the
10 participants.  Now how do you know that?
11      A.  The insureds are the beneficiaries.
12 It's for their benefit.
13      Q.  Okay.  Who is looking out for their
14 benefit under this trust?  Is it AmSouth,
15 United Wisconsin, AMS or someone else?
16      A.  AmSouth holds the policies.
17      MR. WINN:  Listen to his question.
18 If you know the answer, you can give him the
19 answer.  If you don't know the answer, then
20 tell him you don't know the answer.  Ask the
21 question again or read it back.
22           (Record read.)
23      A.  I don't know.

### Page 130

1       Q.  (BY MR. LOWE)  Can you think of
2  anyone at AmSouth that might know the answer
3  to that question?
4       A.  No.
5       Q.  Let's look at paragraph four of your
6  affidavit, Exhibit 5.  Do you need a second
7  to read through it?  It's a longer
8  paragraph.
9       A.  Okay.
10      Q.  Let's look at the first sentence,
11 which states pursuant to the trust
12 agreement, AmSouth does not perform any
13 administrative duties and has no
14 "responsibility" nor [liability] for the
15 collection, remittance, [or] forwarding or
16 payment of premium."  And you site the trust
17 agreement paragraph three that you attached
18 and which is Exhibit 6 to your deposition.
19 Now do you determine that to be a true and
20 correct interpretation of the trust
21 agreement?
22      A.  Yes.
23      Q.  And did you read paragraph three of

### Page 131

1  the trust agreement before you prepared this
2  statement in this affidavit?
3       MR. WINN:  Object to the form of the
4  question, to the extent it misconstrues
5  prior testimony.
6       Q.  Did you?
7       A.  What's your question again?
8       Q.  Did you read paragraph three of
9  Exhibit 6, the trust agreement, before
10 preparing and signing this statement here in
11 paragraph four of Exhibit 5?
12      MR. WINN:  Same objection.
13      A.  I believe I stated before, I read the
14 trust agreement before I signed the
15 affidavit.
16      Q.  Are there any other places in the
17 trust agreement where you believe duties of
18 the trustee were assigned or given to
19 American Medical other than here in
20 paragraph three?
21      MR. WINN:  I'm going to object to the
22 form of that question.  I think that
23 misconstrues the affidavit.

### Page 132

1       Q.  (BY MR. LOWE)  Let me rephrase that.
2  Paragraph three of Exhibit 6 says that
3  trustee shall not assume any responsibility
4  for certain things.  And then it goes on to
5  say nor shall the trustee have any duty or
6  responsibility for certain things.  Now is
7  there any other paragraph in the trust
8  agreement, Exhibit 6, that you rely upon to
9  assert that the trustee doesn't undertake
10 certain obligations?
11      MR. WINN:  Object to the form of the
12 question.  I think it's totally long and
13 confusing.
14      Q.  Do you have an answer?  Just because
15 Harlan is talking doesn't mean you don't
16 have to answer.
17      A.  I would need to read the entire
18 agreement to see if there are other areas.
19      Q.  Well, you read it before you came in
20 here, and you read it before you signed this
21 affidavit, didn't you?
22      A.  Yes, I did.
23      Q.  Okay.

169

1  whatever?
2     A. I'm not sure how the vault is. I
3  don't go down to the vault. I'm not sure
4  how they hold them. They would do it either
5  by the plan, the group insurance trust, or
6  by the security itself.
7     Q. How much or how many pieces of paper
8  do you think this involves?
9        MR. WINN: What involves?
10    Q. Just all this whole Prescription for
11 Good Health Trust.
12    A. This is a relatively small one of the
13 group insurance trusts. It doesn't have any
14 sub industries or -- it's got a master
15 policy, some riders, some amendments.
16    Q. That's the Prescription for Good
17 Health Trust. What about the American
18 Medical Security Trust? It has sub
19 accounts, doesn't it?
20    A. It has volumes.
21    Q. How many pages would that be? Or if
22 you want to equate it to like the size of a
23 banker's box? Do you know what that looks

170

1  like?
2     A. It's more than that.
3     Q. I'm saying how many boxes would that
4  be?
5     A. I couldn't tell you.
6     Q. Well, more than ten?
7     A. I honestly -- no, I don't think so.
8     Q. Looking at Exhibit 6, the trust
9  agreement, paragraph 20, it notes that the
10 trust may be amended upon unanimous consent
11 of the trustee and the insurers. Have you,
12 the bank, ever made an effort upon its own
13 to amend the trust?
14    A. No.
15    Q. Has the bank ever considered
16 terminating the trust?
17       MR. WINN: Let me just object to the
18 extent you are asking for any information
19 that may have come from the legal
20 department. To the extent you are asking
21 her from a business standpoint, if she
22 knows -- and I don't know if she does or
23 not -- I would allow her to answer. But to

171

1  the extent you are requesting any
2  information she may have got from the legal
3  department, I'm going to object. Do you
4  understand the question as I have modified
5  by objection?
6     Q. (BY MR. LOWE) I think he is asking
7  you a question now.
8     A. Would somebody tell me what the
9  question is?
10    Q. Has the bank considered terminating
11 this trust agreement; that is, getting out
12 of it?
13    A. That would be a business decision for
14 the whole line of business, I believe.
15    Q. I know, but you are here to testify
16 on behalf of the bank. Have you ever heard
17 any discussions regarding getting out of
18 this trust agreement?
19    A. There is constant discussion about
20 what lines of business we want to stay in
21 and stay out of.
22    Q. Specifically paragraph seven gives
23 you the right to resign.

172

1     A. Correct.
2     Q. Have there been any discussions
3  within AmSouth Bank about resigning as
4  trustee?
5     A. There have been discussions about
6  exiting this line of business as a whole.
7     Q. For what reason?
8     A. It's not an area that we are focusing
9  on going forward. We really don't want to
10 have products that are flat based fees that
11 are not profitable and don't make money for
12 us. We are there to make money, manage
13 money. That's where we make our money. So
14 going forward would not be taking on any
15 more of these.
16    Q. Well, you have had this one since
17 1994. I mean, has a decision been made to
18 resign at some point?
19    A. Discussions are always ongoing about
20 our different product lines that we offer.
21       MR. WINN: What he is asking you has
22 a specific decision been made that you are
23 aware of to resign from this type of